IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| Earl M. Schneider d/b/a Esthetique Wellness Spa, Inc., | ) ) | Case No. 07 B 03091 |
| | ) | |
| Debtor. | ) | |
| Jay A. Steinberg, not individually but solely as Chapter 7 Trustee, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Adv. Pro. No. 07 A 00642 |
| Sarah I. Schneider, | ) ) ) | |
| Defendant. | ) | Hon. Susan Pierson Sonderby |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes to be heard on the complaint of Jay A. Steinberg, not individually, but as chapter 7 trustee of the estate of Earl M. Schneider d/b/a Esthetique Wellness Spa, Inc., to avoid and recover a fraudulent transfer and for turnover of estate property. A trial was held and the court makes the following findings of fact and conclusions of law. For the reasons stated, the court will enter judgment in favor of the chapter 7 trustee and against Sarah I. Schneider ("Sarah"), as trustee of the Sarah I. Schneider Revocable Trust (the "SIS Trust") on Counts I and III. Judgment will be entered on Count IV in favor of Sarah I. Schneider, in her individual capacity and against the chapter 7 trustee. Count II will be dismissed at the voluntary request of the chapter 7 trustee.

I.   **FINDINGS OF FACT**

**Procedural Background**

On February 22, 2007 (the "Petition Date"), Earl M. Schneider ("Earl") filed a voluntary

petition under chapter 7 of title 11 of the United States Code (the "Code"), his Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "SOFA"). Amended Schedules B through and including H were filed on May 29, 2007. Amended Schedule F shows more than $613,000 of unsecured nonpriority claims held by twenty-five creditors.

Jay A. Steinberg was appointed chapter 7 trustee (the "Trustee"). On July 18, 2007, he filed this four-count adversary complaint (the "Complaint") wherein, exercising his power under section 544(b) of the Code, he seeks to avoid and recover a prepetition transfer of real property from Earl to the SIS Trust, claimed to be fraudulent pursuant to the Illinois version of the Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the "IUFTA") (Counts I and III), or to avoid and recover the same transfer pursuant to sections 548 and 550 of the Code (Count II). The Trustee also seeks from Sarah the turnover of property of the estate consisting of artwork, vintage posters, a dining room set, and a pool table (collectively, the "Artwork and Furnishings") pursuant to section 542(a) of the Code (Count IV). Sarah, Earl's mother and trustee of the SIS Trust, was served with a summons and a copy of the Complaint on July 18, 2007.

At trial, the Trustee advised that he is no longer seeking a judgment on Count II. The Trustee further advised that his theory for avoidance and recovery of the fraudulent transfer pursuant to sections 544(b) and 550 of the Code in Counts I and III is limited to actual fraud under 740 ILCS 160/5(a)(1). Prior to the trial, the parties filed a joint pretrial statement (the "Pretrial Statement"), containing, *inter alia*, a list of stipulated facts (the "Stipulated Facts").

**The Transfer of the Woodmere House**

Having enjoyed some degree of financial success during their marriage, Sarah and her late husband put a fair amount of money into the SIS Trust, which was established in August of 1998.

(Transcript of 11/11/08 Deposition of Sarah I. Schneider ("Dep."), pp. 13-14). Some funds in the SIS Trust were given to Earl "if he needed the money," and other funds were lent to Earl's sister as she went through her divorce. (Dep. pp. 12, 75).

Earl is a self-employed dentist and was married to Jodi Ann Schneider ("Jodi"). Within the one-year period prior to the Petition Date, Earl and Jodi were parties to a pending divorce proceeding that he initiated in 2000 in the Lake County, Illinois Circuit Court. (Trustee's Ex. 16). The court takes judicial notice of the entry of a decision of the Illinois Appellate Court on October 24, 2003, affirming the divorce court's March 4, 2002 dissolution judgment in part and reversing it in part.[1] See In re Marriage of Schneider, 343 Ill.App.3d 628, 278 Ill.Dec. 485, 798 N.E.2d 1242 (2003). The dissolution judgment provided that Jodi was entitled to a $326,000 allocation of marital assets and that Earl had to pay child support.[2] Id. On March 26, 2004, the Illinois Supreme Court granted Earl's leave to appeal the appellate court's decision. See Schneider v. Schneider, 208 Ill.2d 555, 284 Ill.Dec. 346, 809 N.E.2d 1292 (2004)(Table no. 97430). The appellate court's decision was affirmed in part, vacated in part, and remanded by the Illinois Supreme Court on January 21, 2005. See In re Marriage of Schneider, 214 Ill.2d 152, 291 Ill.Dec. 601, 824 N.E.2d 177 (2005).

In the midst of the divorce litigation, Sarah as trustee, caused the SIS Trust to issue a check in the amount of $5,000 to Earl dated February 5, 2001. (Stipulated Facts p. 8). Within the two months after the entry of the dissolution judgment, the SIS Trust issued three more checks to Earl

---

[1] It is proper to take judicial notice of the fact that another court made a decision relating to the matters at issue. Opoka v. I.N.S., 94 F.3d 392, 394-95 (7th Cir. 1996).

[2] In Schedule J, Earl reports that his monthly alimony, maintenance, and support obligations as of the filing of the Schedules total $3,450. Jodi filed a proof of claim in this bankruptcy case asserting attorneys' fees, college expenses, child support arrearage, and reimbursement of medical expenses. She testified that there is still ongoing litigation over child support.

on April 5, 2002 ($35,000), April 6, 2002 ($1,000), and May 1, 2002 ($100,000). (Id.; Dep. pp. 9-13). "Loan to Earl for the House" is written on the memo line of the last check. There are no promissory notes in the record pertaining to the four checks.

On May 30, 2002, Earl, using the $100,000 he received from the SIS Trust, purchased a house on Woodmere Drive in Northbrook, Illinois for $753,000 (the "Woodmere House"). (Stipulated Facts pp. 8-9; Dep. pp. 8, 12, 20). The next day, Earl executed a "Pledge of Personal Property" to Sarah which provided, in part,

> for value received, . . . Earl [] (Pledgor) of 2810 woodmere (*sic*), Northbrook, Il, hereby deposits, delivers to and pledges with Sarah [] (Pledgee) . . ., as collateral security to secure the payment of the following described debt owing Pledgee:
>
> [left blank]
>
> The collateral consisting of the following personal property:
>
> HOME AT 2810 WOODMERE WITH ALL FURNISHINGS AND ANY AND ALL ARTWORK, ITEMS TO BE SECURED BY LOAN IS DINING ROOM SET, KITCHEN SET AND POOL TABLE WHICH HAD BEEN GIFTED BY FATHER IN 1992 UNTIL DEBT OF $108,929.47 IS REPAID IN FULL

(Dep. p. 21; Trustee's Ex. 2). There is no evidence in the record that the Pledge was recorded or otherwise publicized.

Although the Woodmere House is not personal property, it appears that Earl may have initially attempted via the Pledge to put it up as collateral to secure debt to Sarah. There is no evidence in the record that a mortgage on the Woodmere House was given to the SIS Trust.

Less than a year later, on January 24, 2003, Earl quitclaimed the Woodmere House to the SIS Trust. (Stipulated Facts p. 9; Dep. pp. 27-28; Trustee's Ex. 3). There is little, if anything, in the record to suggest that the then existing debt, if any, to the SIS Trust was extinguished via the quitclaim of the Woodmere House. Indeed, the quitclaim deed itself claims exemption from

4

applicable transfer tax asserting that there was less than $100 consideration given by the SIS Trust for the transfer. (Trustee's Ex. 4); *See* 35 ILCS 200/31-45(e).

About two months later, on March 13, 2003, the SIS Trust quitclaimed the Woodmere House back to Earl. (Stipulated Facts p. 9). Sarah testified that she did not recognize the signature on that quitclaim deed as her own. (Dep. p. 38). Within two weeks of reacquiring title to the Woodmere House, Earl obtained a $50,000 home equity line of credit from U.S. Bank, secured by a mortgage on the house. (Stipulated Facts p. 9; Trustee's Ex. 5). The line was taken out to pay down an existing mortgage that Earl had been paying. (Dep. p. 47). There is nothing in the record to indicate the amount of the mortgage debt that was paid down with the $50,000. In connection with applying for the line of credit, Earl executed an Occupancy and Use Statement representing that he would use the Woodmere House as his primary residence and not transfer title until the line was paid in full. (Trustee's Ex.5).

Four months later, on July 29, 2003, Earl, ostensibly as trustee of the Earl M. Schneider Revocable Trust, attempted to quitclaim the Woodmere House back to Sarah. (Stipulated Facts p. 9; Trustee's Ex. 6). The quitclaim was ineffective, however, because there was no such trust in existence, and the then holder of title to the Woodmere House was Earl himself. Sarah testified that she did not recognize the signature of the person who signed this quitclaim deed as her agent. (Dep. p. 54). She did not remember giving anyone authority to sign on her behalf. (Dep. p. 55).

Perhaps recognizing the ineffective transfer of the house from a non-existent trust that was not in title, about eight months later, on March 23, 2004, Earl (this time in his individual capacity) "corrected the scrivener's error," by quitclaiming the Woodmere House to the SIS Trust (the "March 23, 2004 Transfer"). (Stipulated Facts p. 9; Trustee's Ex. 7). Sarah testified that she did not

recognize the signature of her purported agent on this quitclaim deed either. (Dep. p. 56).

After the March 23, 2004 Transfer, the SIS Trust cut checks to Earl in the amounts of $10,000 and $20,000 on May 26, 2004 and June 8, 2004. (Stipulated Facts p. 9). To sum up, the total amount of the checks issued by the SIS Trust to Earl prior to the March 23, 2004 Transfer of the Woodmere House is $141,000. There are no notes in evidence concerning those checks and Sarah does not recall, with the exception of the $100,000, why they were given to Earl. (Dep. p. 12.). The total amount of checks issued by the SIS Trust to Earl after the March 23, 2004 Transfer is $30,000. A promissory note dated June 5, 2004 in the principal amount of $30,000 was executed, but was in favor of Sarah, not the SIS Trust.

Sarah never lived in the Woodmere House and did not make any mortgage payments. (Dep. pp. 59-60). Earl lived in and paid the mortgage on the Woodmere House from the date it was purchased in 2002 until it was sold. (Dep. p. 60). At some unspecified point in time, Sarah and Earl discussed selling the Woodmere House. (Dep. p. 64). According to Sarah, the Woodmere House, "was too much to keep up. It was a very, very big nut to crack; and he [Earl] didn't need it." (Id.). On March 21, 2005, motivated by Earl's desire to cut costs, the SIS Trust sold the Woodmere House to a third-party buyer for $845,000. (Trustee's Ex. 19; Dep. p. 63).

After paying off the existing mortgage and closing costs, the SIS Trust received $196,378.80 from the third-party buyer. (Stipulated Facts p. 9). Within a week, the SIS Trust used the proceeds of the Woodmere House sale to purchase a house in Northbrook on Exeter Drive for $605,000 (the "Exeter House"). (Stipulated Facts p. 9). Although the SIS Trust was the record buyer, Sarah testified that Earl purchased the Exeter House. (Dep. p. 64). As with the Woodmere House, Sarah never lived in the Exeter House; Earl did. (Dep. p. 65).

6

Sarah, as lessor, and Earl, as Lessee, executed an "Agreement to Lease" dated April 1, 2005. (Stipulated Facts p. 9; Dep. p. 66). The monthly rent amount is set forth as equal to the monthly amounts owing on the first and second mortgages on the Exeter House. (Dep. p. 69). The Lease was not reported in the Schedules until the filing of Amended Schedule G. (Trustee's Ex. 16). There is no evidence of the rent payments other than Sarah's testimony (Dep. p. 69) and information reported by Earl in the Statement of Financial Affairs (Id.). There is nothing in the record indicating that a lease existed or rent payments were made with respect to the Woodmere House.

The Trustee seeks in the Complaint to avoid the March 23, 2004 Transfer of the Woodmere House from Earl to the SIS Trust, and to recover the value of that transfer, which he posits is equal to $196,378, representing the proceeds from the sale of the Woodmere House. The Trustee is also asking that the court direct Sarah to turn over the Artwork and Furnishings to him.

## II. CONCLUSIONS OF LAW

### Jurisdiction and Venue

This court has jurisdiction over this core proceeding to determine, avoid, or recover fraudulent conveyances and for turnover of estate property. 28 U.S.C. § 1334(b); Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois; 28 U.S.C. § 157(b)(2)(E) and (H). Venue is proper in this court. 28 U.S.C. § 1409(a).

### Capacity to be Sued Issue

Sarah, for the first time in her post-trial brief, has raised the issue of whether the Trustee has sued the wrong person with respect to the fraudulent transfer. She contends that the Trustee has sued her in her individual capacity and she argues that a judgment cannot be entered against her individually to avoid a fraudulent transfer made to a trust of which she is the sole trustee.

7

Illinois law provides that "[a] written trust possesses a distinct legal existence that is recognized by statute . . . and can sue or be sued through its trustee in a representative capacity on behalf of the trust." Sullivan v. Kodsi, 359 Ill.App.3d 1005, 296 Ill.Dec. 710, 836 N.E.2d 125, 131 (2005)(*citations omitted*). As such, "[t]he party with legal title to the corpus of the trust, the trustee is the proper party to be sued as transferee in fraudulent transfer claims." U.S. on Behalf of F.T.C. v. Larkin, Hoffman, Daly & Lindgren, Ltd., 841 F.Supp. 899, 903 (D. Minn. 1993).

In this matter, the Complaint caption and judgment demand paragraph describes the defendant as "Sarah I. Schneider," omitting the words "in her capacity as trustee of the SIS Trust." The SIS Trust, however, is unmistakably referenced throughout the Complaint. There are repeated allegations implicating "Sarah, as trustee of the SIS Trust" in connection with the fraudulent transfer, (*see, e.g.*, Complaint ¶¶ 8, 9 and 13), culminating in the allegation that the Debtor's transfer of the Woodmere Property "to the Defendant either in the Defendant's individual capacity or in her capacity as trustee of the Trust" was made with the actual intent to hinder, delay or defraud his creditors. (Id. ¶ 34).

Referencing Sarah in the Complaint in her alternative capacities with respect to the fraudulent transfer claim does not necessarily mean that the Trustee sued the wrong party on that claim. Indeed, with one exception not applicable here, a pleading need not even allege a party's capacity to be sued. Fed. R. Civ. P. 9(a)(1)(A); *see also*, 5A Wright and Miller, Federal Practice and Procedure: Civil 3d § 1292. "The rationale behind [Rule 9(a)] is that the nature of the plaintiff's cause of action can be determined from the body of the complaint. Therefore, there is no need for a formal allegation of capacity." Colorado Springs Cablevision, Inc. v. Lively, 579 F.Supp. 252, 255 (D. Colo. 1984) (*citations omitted*). Here, the Trustee's fraudulent transfer claim against the SIS

Trust can clearly be determined from the Complaint.

Sarah herself seemed to recognize this because she did not raise the capacity issue in her affirmative defenses or in any other way prior to the conclusion of the trial. The failure to raise capacity issues in a responsive pleading amounts to a forfeiture. Swaim v. Moltan Co., 73 F.3d 711, 718 (7th Cir. 1996)(interpreting Fed. R. Civ. P. 9(a)). So, even if Sarah's argument that a judgment should not be entered in favor of the Trustee based on the capacity issue were merited, such an argument was waived.

**Fraudulent Transfer of the Woodmere House**

As noted, the Trustee is utilizing his power under section 544(b)(1) to "commandeer the rights of an unsecured creditor who could have avoided the transfer under applicable law, in this case the Illinois Fraudulent Transfer Act." Friedrich v. Mottaz, 294 F.3d 864, 867 (7th Cir. 2002). "In a matter under § 544(b)(1), the trustee has the rights of an unsecured creditor to avoid transactions that can be avoided by such creditor under state law. The trustee need not identify the creditor, as long as an unsecured creditor exists." In re Phillips, 379 B.R. 765, 776 (Bankr. N.D. Ill. 2007)(*citations omitted*).

The Trustee contends that the March 23, 2004 Transfer can be avoided under section 160/5(a)(1) of the IUFTA, which is described as the "'actual fraud' avoidance provision of that Act because of its 'intent ingredient.'" Id., n. 1 (*citing* In re FBN Food Servs., Inc., 82 F.3d 1387, 1394 (7th Cir. 1996)). Under the actual fraud provision, a transfer is "fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the

9

debtor." 740 ILCS 160/5(a)(1). Accordingly, to prevail here the Trustee must prove that the March 23, 2004 Transfer of the Woodmere House was made with the actual intent to hinder, delay, or defraud any of Earl's creditors. In re Eckert, 388 B.R. 813, 839 (Bankr. N.D. Ill. 2008), *aff'd* Grochocinski v. Schlossberg, 402 B.R. 825 (N.D. Ill. 2009).

"Direct proof of actual intent to defraud is not required - indeed, it would be hard to come by - and a trustee can prove actual intent by circumstantial evidence." Mottaz, 294 F.3d at 869-70. Circumstances indicative of actual fraudulent intent are called "badges of fraud" and a number of them are set forth in the IUFTA. They include: whether the transfer was to an insider, whether the debtor retained possession or control of the property after the transfer, whether the transfer was concealed, whether before the transfer was made, the debtor had been sued or threatened with suit, whether the debtor received reasonably equivalent value for the transfer, and whether the transfer occurred shortly before or shortly after a substantial debt was incurred. 740 ILCS 160/5(b).

While fraud may be inferred from a sufficient number of badges, In re Zeigler, 320 B.R. 362, 373 (Bankr. N.D. Ill. 2005), it is important to recognize that the badges are neither exhaustive nor additive. Brandon v. Anesthesia & Pain Management Associates., Ltd., 419 F.3d 594, 600 (7th Cir. 2005). Rather, the badges are correctly viewed as "symptoms of fraud." Id. Indeed, they are statutorily described as *"among the factors* that may be considered in determining actual intent." 740 ILCS 160/5(b)(*emphasis added*).

To adequately analyze the existence of actual fraudulent intent, however, the court should address more than one of the badges. Hong Kong Electro-Chemical Works, Ltd. v. Less, 539 F.3d 795, 801 (7th Cir. 2008). Moreover, the badges should be viewed in the context of the transfer. *See*

U.S. v. Engh, 330 F.3d 954, 956 (7th Cir. 2003). For example, a transfer to a family member "doesn't always raise eyebrows, [but] eyebrows must be raised . . . when the transfer is viewed in the context of what else was going on in [the transferor's] life when the conveyance was made." Id. at 956. Gauging what else is going on in the transferor's life at the time of the transfer assists in determining the primary motivation for the transfer. If the primary motivation for the transfer is based on fraudulent intent, other motivations may be urged, but they are irrelevant. See Id. (Court affirmed finding of actual fraudulent intent, noting that "[r]egardless of what other motivations for the transfer may have been present, a clear intent to avoid a creditor . . . was also present."); King v. Ionization Int'l Inc., 825 F.2d 1180, 1186 (7th Cir. 1987)(Court held that "[a] transfer by a debtor to one creditor, even though for consideration, is still a fraud against other creditors if there is intent to defraud. Such an intent will be found if the circumstances indicate that the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt.").

Although it is clear that the Trustee bears the burden to demonstrate actual fraud under 160/5(a)(1), the issue of the appropriate quantum of proof that burden carries has been described as "not well settled." In re Edgewater Med. Ctr., 373 B.R. 845, 856 n. 20 (Bankr. N.D. Ill. 2007). Courts are somewhat divided on the issue of whether the trustee bringing a state law actual intent avoidance action is burdened with the clear and convincing standard or the preponderance of evidence standard. Id. The clear and convincing standard requires a plaintiff to present evidence that "leaves no doubt in the fact finder's mind about the truth of the proposition in question." In re Lisa P., 381 Ill.App.3d 1087, 320 Ill.Dec. 552, 887 N.E.2d 696, 701 (2008).[3] The preponderance

---

[3]

Illinois burden of proof law is cited here because the Trustee is asserting a claim under the IUFTA and "the burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden

of evidence standard requires a plaintiff to prove that the proposition at hand is "more probably true than not true." Hanson-Suminski v. Rohrman Midwest Motors, Inc., 386 Ill.App.3d 585, 325 Ill.Dec. 461, 898 N.E.2d 194, 202 (2008)(*citing* Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill.2d 100, 191, 296 Ill.Dec. 448, 835 N.E.2d 801 (2005)).

The Trustee in this matter asserts that he is burdened with the clear and convincing standard. Because the Trustee has, for the reasons that follow, met the clear and convincing standard the court does not definitively reach the quantum of proof issue.

The IUFTA provides that a transfer is not avoidable under the actual intent provision against a person who took in good faith and for a reasonably equivalent value. 740 ILCS 160/9(a); Zeigler, 320 B.R. at 374, In re Hennings Feed and Crop Care, Inc. 365 B.R. 868, 878 (Bankr. C.D. Ill. 2007). The transferee has the burden of establishing both good faith and reasonably equivalent value. In re Spatz, 222 B.R. 157, 168-69 (N.D. Ill. 1998). Accordingly, the avoidance of a transfer cannot be thwarted even if the defendant has paid full consideration for it, if he cannot also show that he took the transfer in good faith. Id.; *see also* Scholes v. Lehmann, 56 F.3d 750, 759 (7th Cir. 1995)(Court observed that the "[i]nadequacy of consideration is not an element of fraud in fact, so that without full restitution the deterrent effect of the fraudulent conveyance law would be greatly weakened.").

As for reasonably equivalent value, "[t]he Seventh Circuit has said that the determination of reasonably equivalent value is not made by a fixed mathematical formula, but by a comparison of the value of what was transferred to the value of what the debtor received in exchange." Hennings, 365 B.R. at 878 (*citing* Barber v. Golden Seed Co., Inc., 129 F.3d 382, 387 (7th Cir. 1997)).

---

of proof that normally comes with it." Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000).

Moreover, the Seventh Circuit has noted that "[f]or obvious reasons, judges are particularly insistent upon proof of commensurability when they are dealing with intrafamilial transfers attacked as fraudulent conveyances." Scholes, 56 F.3d at 758 (7th Cir. 1995)(*citations omitted*). The Scholes Court commented that the husband's transfers to his ex-wife in that case "were lavish, and the principal 'obligation' that they are claimed to have discharged was one created by a voluntary settlement that received no judicial scrutiny. Given the scale of the transfers and the family setting, it was the ex-wife's burden to prove that the consideration for the transfers she received was in fact adequate, commensurate." Id.

Good faith is not precisely defined in the IUFTA, and Illinois courts have not supplied a definition. For Your Ease Only, Inc. v. Calgon Carbon Corp., 560 F.3d 717, 721 (7th Cir. 2009). Indeed, courts generally shy away from formulating a precise definition. Id. Even so, a plausible, non fraudulent explanation for a transfer may be indicative of good faith. *See* Scholes, 56 F.3d at 759; Edgewater Med., 373 B.R. at 856; In re Grove-Merritt, 406 B.R. 778, 802 (Bankr. S.D. Ohio 2009)(Ohio law).

It is often an easier task to determine the absence, as opposed to presence, of good faith. For Your Ease Only, 560 F.3d at 721. Clearly, an active participant in the fraud does not possess good faith. *See* Alan Drey Co., Inc. v. Generation, Inc., 22 Ill.App.3d 611, 317 N.E.2d 673, 680 (1974). Moreover, there is an absence of good faith when transferees knew or should have known from the things going on in the transferor's life that the transfer was suspicious. Id. For example, it has been held that transferees did not possess good faith if they took the transfer notwithstanding their knowledge that a creditor had sued the transferor. Kennedy v. Four Boys Labor Serv., Inc., 279 Ill.App.3d 361, 216 Ill.Dec. 160, 664 N.E.2d 1088, 1093 (1996).

13

Case 07-00642    Doc 69    Filed 09/30/09    Entered 10/01/09 10:12:09    Desc Main
          Document      Page 14 of 20

If the plaintiff is successful in establishing that the transfer was actually fraudulent and the defendant fails to show good faith or reasonably equivalent value, the transfer is avoidable. 740 ILCS 160/8(a)(1). Consequently, the plaintiff may recover judgment against the first transferee for the value of the asset transferred. 740 ILCS 160/9(b); Eckert, 388 B.R. at 842. If the judgment is based on the value of the asset transferred, it "must be equal to the value of the asset[] at the time of the transfer, subject to adjustment as the equities may require." 740 ILCS 160/9(c). The net proceeds from a subsequent resale of the transferred asset may be used to set the value of that asset. See Eckert, 388 B.R. at 857.

Good faith transferees are entitled to, *inter alia*, a reduction in the amount of the liability on the judgment to the extent of the value given the debtor for the transfer. 740 ILCS 160/9(d). On the other hand, if actual fraud is found and the transferee knew or should have known of the fraudulent intent, the transfer is set aside in full. See U.S. v. Brown, 820 F.Supp. 374, 383 (N.D. Ill. 1993). The Seventh Circuit explains in dicta that any claims that the transferee who lacks good faith may have are effectively "extinguished by a finding of actual fraud (and her complicity); they would simply be thrown into the pool with the claims of other creditors . . . the assets of which would be augmented by the judgment against her." Scholes, 56 F.3d at 759.

In this matter, there are several badges present that, when viewed in the context of the transfer, are indicative of fraudulent intent. The parties have stipulated that the transfer was to an insider. (Stipulated Fact 3). Earl transferred the Woodmere House to his mother's trust in the midst of his contentious divorce litigation that eventually found its way up to the Illinois Supreme Court. Sarah never lived in the Woodmere House nor did she pay the mortgage. Earl lived in the Woodmere House and paid the mortgage. When Earl needed cash to pay down his mortgage, title

to the house was taken out of the SIS Trust and placed in Earl's name. Shortly thereafter, title to the Woodmere House was put back into the SIS Trust's name. The house was sold when it turned out to be too expensive for Earl. The sales proceeds were used to buy a new, less expensive house to accommodate him.

All of the quitclaim deeds indicate that the transfers were exempt from transfer tax, meaning little or no consideration was given. As the Trustee points out, this statement can be taken two ways. Either the quitclaim deeds were correct and little or no consideration was given, or the quitclaim deeds were incorrect and the true nature of the transactions was concealed. *See* In re Phillips, 379 B.R. 765, 782 (Bankr. N.D. Ill. 2007).

All of the foregoing are circumstantial indicia of actual fraudulent intent. In defense, Sarah puts forth two seemingly contradictory arguments to show that the SIS Trust took title to the Woodmere House in good faith and for reasonably equivalent value. First, she contends in her Answer that the Woodmere House was quitclaimed to the SIS Trust to payoff existing debt. As noted, prior to Earl's purchase of the Woodmere House, the SIS Trust cut $141,000 worth of checks to him. After the purchase, there were three quitclaim transfers of the Woodmere House in relatively close succession between Earl and the SIS Trust - from Earl to the SIS Trust on January 24, 2003, from the SIS Trust to Earl on March 13, 2003, and then the March 23, 2004 Transfer from Earl to the SIS Trust. There is no evidence in the record that the $141,000 debt was extinguished by the first transfer in January 2003, or if so, by what amount. Even assuming, however, there was evidence of a commensurate payoff, that may shield only the first transfer in January 2003 from avoidance. If the first transfer in January paid off the debt there was then no debt to be paid by the later March 23, 2004 Transfer. Thus, the payoff argument is not a plausible explanation for the March 23, 2004

15

Transfer.

In her post-trial brief, Sarah raises another argument to establish good faith and reasonably equivalent value. She contends that the SIS Trust served as "Earl's on-going credit facility" and the transfers of the Woodmere House were made "to credit enhance the on-going credit facility with Earl," which allowed the SIS Trust "the position to continue to advance funds to Earl." (Post-Trial Brief of Sarah I. Schneider, pp. 3, 9, and 12). By not raising it until after trial, that argument may have been waived. Putting a waiver aside, however, the argument is not particularly helpful to show good faith. Assuming the motivation was to secure repayment of debt, that is typically accomplished via a mortgage, not an outright transfer of ownership. Indeed, outright transfers to secure repayment may indicate a "secret trust," which is usually found to be fraudulent. *See* Svalina v. Saravana, 341 Ill. 236, 173 N.E. 281 (1930)("where a grantee takes a conveyance absolute upon its face and attempts to set it up as a purchase when in truth is a mere security for a debt, such conduct will, under most circumstances, be regarded as a fraud, and will prevent such grantee from claiming to be a bona fide mortgagee.").

Moreover, Sarah relies on this credit-enhancement idea to argue that Jodi was not defrauded by the March 23, 2004 Transfer. Sarah urges in this regard that having title to the Woodmere House constituted "credit-enhancement," enabling the SIS Trust to give monies to Earl to satisfy Jodi's claim. Sarah explains that "because of the credit-enhancement (*i.e.*, taking title to the Woodmere House), the SIS Trust would not have allowed the Jodi Claim to encumber the Woodmere [House] through a Memorandum of Judgment filed with the Cook County Recorder of Deeds." (Post-Trial Brief of Sarah I. Schneider p. 13). There are two problems with that argument. First, there is no evidence that Jodi's claim, which Sarah admits existed at the time of the March 23, 2004 Transfer,

was paid or was to be paid by Earl with the monies he received from the SIS Trust. Second, by claiming that the March 23, 2004 Transfer of the Woodmere House from Earl to the SIS Trust prevented Jodi from recording a Memorandum of Judgment against the house, Sarah has demonstrated an understanding that the transfer frustrated Jodi's ability to recover on her claim.

Finally, it has been demonstrated that when the March 23, 2004 Transfer was made, Sarah knew about the ongoing divorce litigation, which she described as "horrible." (Dep. p. 18). She testified that the SIS Trust taking title to the Woodmere House was motivated "out of concerns about the divorce that was going on." (Dep. p. 34). She offered that "We [Earl and Sarah] both discussed [the idea that the property should be put in the SIS Trust's name] because of the circumstances involved." (Dep. p. 26). She further explained why the SIS Trust took title to the Woodmere House, as opposed to giving a mortgage:

> [M]y son is divorced. I loaned him the money. I was thinking God forbid, if anything happens to my son, all this will go to - this is in my mind - to his children; and his ex-wife will be the executor. We didn't want that. I wanted the collateral so God forbid, if anything happened to my son, it would go into my trust and be part of my estate.
>
> . . .
>
> Like I said, it all was relevant, like I said, to the money I loaned him. And I felt that it would be safer if I was the one that owned the property as I said. It was a very bad divorce. And like we - - - I thought, God forbid, if anything happened, I did not want my ex-daughter-in-law to benefit from the house or the furnishings.

(Dep. pp. 25-26 and 32).

Giving a deed for a house that you continue to live in so an estranged family member/creditor, with whom you are involved in litigation, will in no way benefit from it smacks of bad faith. See Franceschi v. Franceschi, 326 Ill.App. 494, 62 N.E.2d 1 (1945).

In summary, the Trustee has demonstrated actual fraudulent intent and the SIS Trust has not

17

demonstrated good faith or that the transfer was for reasonably equivalent value. The Trustee is thus entitled to avoidance of the transfer and may recover judgment against the SIS Trust for the value of the asset transferred, which is $196,378.80 (the amount of net proceeds from the subsequent resale of the Woodmere House).

**Turnover of the Artwork and Furnishings**

In Count IV of the Complaint, the Trustee seeks a judgment requiring Sarah, in her individual capacity, to deliver the Artwork and Furnishings to him pursuant to section 542(a) of the Code. Section 542(a) provides, in pertinent part, that "an entity. . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). The party seeking turnover bears the burden of proof. In re Lyckberg, 310 B.R. 881, 888 (Bankr. N.D. Ill. 2004). In order to be entitled to recover the property or its value, the plaintiff must establish that the defendant possessed the property during the bankruptcy case. In re Gentry, 275 B.R. 747, 750 (Bankr. W.D. Va. 2001).

In this matter, there is scant evidence in the record about the Artwork and Furnishings, particularly who has had possession of them since the Petition Date. Certain nine to seventeen-year old purchase invoices for the dining room set and art prints were introduced. Earl lists the Artwork and Furnishings on Schedule B. That Schedule asks the debtor "[if] the property is being held for the debtor by someone else, [to] state that person's name and address under [the] 'Description and Location of Property'" column of the Schedule. Earl did not indicate in that column that Sarah or anyone else was holding the Artwork and Furnishings. Jodi testified that the last time she saw the Artwork and Furnishings was at the end of 2000 - about seven years before the Petition Date. Sarah

18

testified only about the pool table. She praised its better grain of wood and commented that her husband purchased the expensive table and gifted it to her son. (Dep. pp. 21, 22).

Sarah admits that she "held control, custody, ownership of all or most of the personal property, including the dining room set and pool table." (Trustee's Ex. 19). There is no evidence in the record, however, that Sarah was in possession of any of the Artwork and Furnishings at any time during the pendency of the bankruptcy case. Indeed, the Trustee states in his post-trial brief that "[t]here is no evidence at all that the [Artwork and Furnishings] has ever been in the possession of anyone but the Debtor." (Trustee's Post-Trial Brief p. 13). The Trustee has not shown that Sarah was in possession of the Artwork and Furnishings at any time since the Petition Date. The Trustee has therefore failed to demonstrate one required element of his turnover claim. Accordingly, judgment will be entered in Sarah's favor on Count IV.

### III. CONCLUSION

Judgment will be entered in favor of Jay Steinberg, not individually, but as chapter 7 trustee of the estate of Earl M. Schneider, and against Sarah I. Schneider, not individually, but as trustee of the Sarah I. Schneider Revocable Trust on Counts I and III in the amount of $196,378.80. Judgment

will be entered on Count IV in favor of Sarah I. Schneider, in her individual capacity, and against Jay Steinberg, not individually, but as chapter 7 trustee of the estate of Earl M. Schneider. Count II will be dismissed at the voluntary request of the chapter 7 trustee.

Date:    SEP 3 0 2009              ENTER:

                                   _____
                                   Hon. Susan Pierson Sonderby
                                   United States Bankruptcy Judge